IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

EMILY E. DWYER,

       Plaintiff,

      vs.                                                                    Civ. No. 20-80  JFR

ANDREW SAUL, Commissioner
of SOCIAL SECURITY,

       Defendant.


## MEMORANDUM OPINION AND ORDER[1]

    **THIS MATTER** is before the Court on the Social Security Administrative Record (Doc. 22) filed September 10, 2020, in support of Plaintiff Emily E. Dwyer's ("Plaintiff") Complaint (Doc. 1) seeking review of the decision of Defendant Andrew Saul, Commissioner of the Social Security Administration ("Defendant" or "Commissioner") denying Plaintiff's claim for Title II disability insurance benefits.  On December 14, 2020, Plaintiff filed her Motion to Reverse and Remand for Award of Benefits, or in the Alternative, for Rehearing, With Supporting Memorandum.  Doc. 28.  The Commissioner filed a Response in opposition on February 16, 2021 (Doc. 31), and Plaintiff filed a Reply on February 19, 2021 (Doc. 32).  The Court has jurisdiction to review the Commissioner's final decision under 42 U.S.C. §§ 405(g) and 1383(c).  Having meticulously reviewed the entire record and the applicable law and being fully advised in the premises, the Court finds the Motion is well taken and is **GRANTED.**

---

[1] Pursuant to 28 U.S.C. § 636(c), the parties consented to the undersigned to conduct any or all proceedings, and to enter an order of judgment, in this case.  Docs. 3, 8, 9.

## I. <u>Background and Procedural History</u>

Plaintiff Emily Dwyer ("Ms. Dwyer") alleges that she became disabled on October 21, 2016,[2] at the age of fifty, because of hypothyroidism, physical exhaustion, impaired memory, muscle weakness, impaired cognitive function, depression, anxiety, sleep disorder, and hormone imbalance.  Tr. 258, 262.  Ms. Dwyer has a Bachelor of Arts Degree in English and a Master's Degree in Business Administration.  Tr. 55-56, 797, 1542.  Ms. Dwyer has worked as a financial advisor and fundraising consultant.  Tr. 247-57, 283, 280-89.  Ms. Dwyer reported she made changes in her work schedule beginning in May 2015 as the result of her alleged impairments. Tr. 263.

On October 24, 2016, Ms. Dwyer filed an application for Social Security Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. § 401 et seq.  Tr. 209-15. On February 17, 2017, Ms. Dwyer's application was denied.  Tr. 84-100, 101, 142-45.  It was denied again at reconsideration on September 7, 2017.  Tr. 102-131, 132, 151-54.  At Ms. Dwyer's request, Administrative Law Judge (ALJ) Michelle K. Lindsay held a hearing on August 6, 2018.  Tr. 50-83.  Ms. Dwyer appeared in person at the hearing with attorney representative Michelle Baca.[3]  *Id*.  On December 18, 2019, ALJ Lindsay issued an unfavorable decision.  Tr. 23-41.  Ms. Dwyer appealed the unfavorable decision to the Appeals Council and on June 24, 2019, the Appeals Council declined review.  Tr. 1-6.  Ms. Dwyer timely appealed to the United States District Court for the District of New Mexico.  Doc. 1.

---

[2] Ms. Dwyer initially alleged an onset date of August 1, 2014, but amended the onset date at the Administrative Hearing to October 21, 2016.  Tr. 54.

[3] Ms. Dwyer is represented in these proceedings by attorneys Gary J. Martone and Feliz MariSol Martone.  Doc. 1.

## II. Applicable Law

### A. Disability Determination Process

An individual is considered disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A) (pertaining to disability insurance benefits); *see also* 42 U.S.C. § 1382(a)(3)(A) (pertaining to supplemental security income disability benefits for adult individuals). The Social Security Commissioner has adopted the familiar five-step sequential analysis to determine whether a person satisfies the statutory criteria as follows:

(1)     At step one, the ALJ must determine whether the claimant is engaged in "substantial gainful activity."[4]  If the claimant is engaged in substantial gainful activity, she is not disabled regardless of her medical condition.

(2)     At step two, the ALJ must determine the severity of the claimed physical or mental impairment(s).  If the claimant does not have an impairment(s) or combination of impairments that is severe and meets the duration requirement, she is not disabled.

(3)     At step three, the ALJ must determine whether a claimant's impairment(s) meets or equals in severity one of the listings described in Appendix 1 of the regulations and meets the duration requirement.  If so, a claimant is presumed disabled.

(4)     If, however, the claimant's impairments do not meet or equal in severity one of the listings described in Appendix 1 of the regulations, the ALJ must determine at step four whether the claimant can perform her "past relevant work."  Answering this question involves three phases. *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996). First, the ALJ considers all of the relevant medical and other evidence and determines what is "the most [claimant] can still do despite [her physical and mental] limitations." 20

---

[4] Substantial work activity is work activity that involves doing significant physical or mental activities."  20 C.F.R. §§ 404.1572(a), 416.972(a).  "Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." *Id.*  "Gainful work activity is work activity that you do for pay or profit."  20 C.F.R. §§ 404.1572(b), 416.972(b).

C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). This is called the claimant's residual functional capacity ("RFC"). *Id.* §§ 404.1545(a)(3), 416.945(a)(3). Second, the ALJ determines the physical and mental demands of claimant's past work. Third, the ALJ determines whether, given claimant's RFC, the claimant is capable of meeting those demands. A claimant who is capable of returning to past relevant work is not disabled.

(5)     If the claimant does not have the RFC to perform her past relevant work, the Commissioner, at step five, must show that the claimant is able to perform other work in the national economy, considering the claimant's RFC, age, education, and work experience. If the Commissioner is unable to make that showing, the claimant is deemed disabled. If, however, the Commissioner is able to make the required showing, the claimant is deemed not disabled.

*See* 20 C.F.R. § 404.1520(a)(4) (disability insurance benefits); 20 C.F.R. § 416.920(a)(4) (supplemental security income disability benefits); *Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005); *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005). The claimant has the initial burden of establishing a disability in the first four steps of this analysis. *Bowen v. Yuckert*, 482 U.S. 137, 146, n.5. The burden shifts to the Commissioner at step five to show that the claimant is capable of performing work in the national economy. *Id.* A finding that the claimant is disabled or not disabled at any point in the five-step review is conclusive and terminates the analysis. *Casias v. Sec'y of Health & Human Serv.*, 933 F.2d 799, 801 (10th Cir. 1991).

## B.     Standard of Review

This Court must affirm the Commissioner's denial of social security benefits unless (1) the decision is not supported by "substantial evidence" or (2) the ALJ did not apply the proper legal standards in reaching the decision. 42 U.S.C. § 405(g); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004); *Casias*, 933 F.2d at 800-01. In making these determinations, the Court "neither reweigh[s] the evidence nor substitute[s] [its] judgment for that of the agency.'" *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008). "[W]hatever the meaning of 'substantial' in other contexts, the threshold for such

evidentiary sufficiency is not high." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

Substantial evidence "is 'more than a mere scintilla.'" *Id.* (quoting *Consol. Edison Co. v. NLRB*,

305 U.S. 197, 229 (1938)).  "It means—and means only—such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion." *Id.* (internal quotation marks omitted).

A decision "is not based on substantial evidence if it is overwhelmed by other evidence in

the record," *Langley*, 373 F.3d at 1118, or "constitutes mere conclusion."  *Musgrave v. Sullivan*,

966 F.2d 1371, 1374 (10th Cir. 1992).  The agency decision must "provide this court with a

sufficient basis to determine that appropriate legal principles have been followed."  *Jensen v.

Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005).  Therefore, although an ALJ is not required to

discuss every piece of evidence, "the record must demonstrate that the ALJ considered all of the

evidence," and "the [ALJ's] reasons for finding a claimant not disabled" must be "articulated with

sufficient particularity."  *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996).  But where the

reviewing court "can follow the adjudicator's reasoning" in conducting its review, "and can

determine that correct legal standards have been applied, merely technical omissions in the ALJ's

reasoning do not dictate reversal."  *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1166 (10th Cir.

2012).  The court "should, indeed must, exercise common sense."  *Id.*  "The more comprehensive

the ALJ's explanation, the easier [the] task; but [the court] cannot insist on technical perfection."

*Id.*

### III.  <u>Analysis</u>

The ALJ made her decision that Ms. Dwyer was not disabled at step five of the sequential

evaluation. Tr. 39-41.  Specifically, the ALJ found that Ms. Dwyer met the insured status

requirements through June 30, 2018.  Tr. 28.  The ALJ found that Ms. Dwyer had not engaged in

substantial gainful activity since her alleged onset date of August 1, 2014 [sic].[5]  *Id.*  The ALJ

determined that Ms. Dwyer had severe impairments of physical and mental residuals from

low-level carbon monoxide exposure, hypothyroidism, migraine headaches, fibromyalgia,

depression, anxiety, and somatic symptom disorder.  *Id.*  The ALJ determined that Ms. Dwyer did

not have an impairment or combination of impairments that met or medically equaled the severity

of a listing.  Tr. 28-29.  Proceeding to step four, the ALJ, after careful consideration of the record,

found that Ms. Dwyer had the residual functional capacity to

> perform a reduced range of light work as defined in 20 CFR 404.1567(b).
> Specifically the claimant is able to lift, carry, push, and pull twenty pounds
> occasionally and ten pounds frequently; sit for at least six hours in an eight-hour
> workday; and stand and walk for six hours in an eight-hour workday.  She must
> avoid more than occasional exposure to extreme heat or cold.  She must completely
> avoid unprotected heights.  She cannot work in more than moderate noise.  She must
> avoid more than occasional exposure to fumes, odors, dust, gases, or poor
> ventilation.  She is able to understand, remember, and carry out simple instructions,
> and is able to maintain attention and concentration to perform and persist at simple
> tasks for two hours at a time without requiring redirection to task.  She can have
> occasional contact with the general public and superficial interactions with
> co-workers and supervisors.  She requires work involving no more than occasional
> change in the routine work setting.

Tr. 30.  The ALJ further concluded at step four that Ms. Dwyer was not capable of performing her

past relevant work.  Tr. 30-39.  At step five, the ALJ found that considering Ms. Dwyer's age,

education, work experience, residual functional capacity, and the testimony of a vocational expert

(VE), there are jobs that exist in significant numbers in the national economy that Ms. Dwyer

could perform.  Tr. 39-41.  The ALJ, therefore, determined that Ms. Dwyer was not disabled.  *Id.*

        In her Motion, Ms. Dwyer argues first that the ALJ erred by failing to consider properly

the medical opinion evidence.  Doc. 28 at 6-15.  In particular, Ms. Dwyer argues that (1) the

---

[5] *See* fn. 2, *supra.*

ALJ's reasons for rejecting the opinion of examining State agency psychological consultant

Warren M. Steinman are not supported by substantial evidence; (2) the ALJ erred in evaluating

the medical opinion of Nathan Holladay, M.D., who evaluated Ms. Dwyer for fibromyalgia and

chronic fatigue syndrome (CFS), and that the ALJ's reasons for rejecting his opinion are not

supported by substantial evidence; and (3) the ALJ failed to provide specific reasons for rejecting

Neuropsychologist Lynette M. Abrams-Silva, M.D.'s opinion.  *Id.*  Ms. Dwyer also argues that

the ALJ improperly rejected Ms. Dwyer's statement concerning her symptoms.  *Id.* at 15-20.  Ms.

Dwyer argues that, because the record supports a finding of disability, the Court should exercise

its authority and reverse for an award of benefits.  *Id.* at 20.

      For the reasons discussed below, the Court finds that the ALJ's reasons for rejecting

Dr. Steinman's opinion are not sufficiently specific and not supported by substantial evidence.

The Court also finds that the ALJ failed to provide explanations supported by substantial evidence

for rejecting Dr. Holladay's opinion.  This case, therefore, requires remand.

      **A.**    **Relevant Medical Evidence**

          **1.**    **Warren M. Steinman, Ph.D.**

      On February 12, 2017, Ms. Dwyer presented to Warren M. Steinman, Ph.D., for a mental

status exam.[6]  Tr. 781-92.  Ms. Dwyer reported a history of hypothyroidism, migraines, anxiety,

chronic pain, and insomnia.  Tr. 783-84.  Ms. Dwyer reported that she occasionally has good

days, she is moody, and she cannot remember things.  Tr. 784.  Ms. Dwyer reported feeling sad

and wanting to sleep a lot.  *Id.*

---

[6] Dr. Steinman noted that Ms. Dwyer had presented for a mental status examination and WAIS-IV testing on February 24, 2016, for the same purpose, *i.e.,* to assist the DDS in determining Ms. Dwyer's ability to do work-related mental activities for purposes of disability.

Dr. Steinman took Ms. Dwyer's family, personal, education, work and medical histories. Tr. 782-84.  Dr. Steinman observed that Ms. Dwyer was well-groomed, teary, red faced, anxious, closed her eyes frequently, made poor eye contract, and was self-demeaning about her present inabilities.  Tr. 781-782.  Dr. Steinman observed that Ms. Dwyer's speech was articulate, but anxious and pressured; her mood/affect was elevated, extremely anxious, nervous, and emotionally labile; her memory was adequate, but not as good as she thinks it should be; and that her judgment was limited.  *Id.*  Dr. Steinman described Ms. Dwyer as very anxious and worried about the apparent decreases in her memory and general functioning.  Tr. 787.  Dr. Steinman indicated that Ms. Dwyer is taking medications for migraine headaches, hypothyroidism, insomnia, hormonal imbalances, and chronic pain.  *Id.*  Dr. Steinman noted that Ms. Dwyer continually worries about constant fatigue and tiredness, forgetfulness, and losing intellectual competence.  *Id.*

Dr. Steinman administered simple orientation and short-term memory tasks and concluded that Ms. Dwyer "exhibited no major problems with concentration, information, orientation, or short-term memory" on those tasks.  Tr. 784.  Dr. Steinman also administered the Wechsler Adult Intelligence Scale – IV (WAIS-IV) and indicated that Ms. Dwyer understood the subtest instructions and seemed to be trying her best.  Tr. 784-85.  Dr. Steinman summarized the results of the WAIS-IV testing as follows:

> Ms. Dwyer's WAIS-IV results in the present session are almost identical to the results obtained in the 2016 testing.  They indicate that, overall, she is functioning intellectually within the average range of adult intelligence.  However, there is considerable variability in her intellectual abilities.  Her vocabulary and fund of information are comparative strengths within her WAIS-IV results; whereas, her short-term memory, short-term working memory, and her cognitive-processing speed are comparative weaknesses amongst her intellectual abilities.  Her short-term working memory and her cognitive-processing speed are significantly poorer than her other intellectual abilities.  These differences suggest a possible cognitive disorder and need to be assessed in more detail.

Tr. 787.  Dr. Steinman further summarized:

> Ms. Dwyer is exceedingly anxious and depressed.  She feels helpless, sees herself
> as declining cognitively, and feels out of control.  She is worried that she is losing
> her cognitive abilities and she is moody and emotional.  She is able to understand
> most instructions, but her anxiety, her lack of self-confidence, and her fatigue are
> interfering with her ability to carry out tasks required of her.  The anxiety also may
> be interfering with her short-term memory and cognitive-processing speed.  Given
> her distress, she is likely to be markedly limited in being able to work effectively
> and productively with co-workers.  She feels she is underperforming, which
> increases her anxiety and lowers her self-esteem further.  Until her anxiety can be
> controlled and her memory issues can be defined, she is likely to be markedly limited
> in being able to adapt to changing circumstances.  She clearly has the intellectual
> abilities and the experience to manage her own financial resources.

Tr. 788.  Dr. Steinman assessed that Ms. Dwyer was (1) able to understand most instructions, but

her anxiety, depression and lowered self-esteem may interfere; (2) is *markedly limited* by anxiety

and worry in being able to carry out the tasks she understands; (3) has limited judgment/decision

making ability; (4) is *markedly limited* in being able to relate effectively with others; (5) is

*markedly limited* in being able to work productively or effectively with co-workers; (6) is able to

accept supervision; and (7) is *markedly limited* in being able to adapt to changing circumstances.

*Id.*

> The ALJ did not accord Dr. Steinman's opinion any specific weight.  Instead, she stated:

> Dr. Steinman opined the claimant is markedly limited by anxiety and worry in being
> able to carry out the tasks she understands; relating effectively with others; working
> productively or effectively with coworkers; and being able to adapt to changing
> circumstances (18F).  This opinion is [] not consistent with the record.  The record
> demonstrates no marked limitations.  Additionally, the claimant's mental health
> symptoms have improved with treatment.  Finally, this opinion is not consistent with
> the neuropsychological evaluation which was performed only 6 months later and not
> for the sole purpose of determining disability benefits (see 30F).

Tr. 39.

### 2.      Richard Sorenson, Ph.D.

On February 17, 2017, nonexamining State agency psychological consultant Richard

Sorensen, Ph.D., reviewed the medical evidence record at the initial level of review.  Tr. 790-92,

95-97.  Dr. Sorenson prepared a Psychiatric Review Technique ("PRT")[7] and rated the degree of

Ms. Dwyer's functional limitation in the area of activities of daily living as mild, in the area of

maintaining social functioning as moderate, in the area of maintaining concentration, persistent

and pace as moderate, and in the area of adaptation as mild.  Tr. 90-92.  Dr. Sorenson also

prepared a Mental Residual Functional Capacity Assessment ("MRFCA")[8] in which he found in

Section I that Ms. Dwyer had *moderate limitations* in her ability to (1) understand and remember

detailed instructions; (2) maintain attention and concentration for extended periods; (3) perform

activities in a schedule, maintain regular attendance, and be punctual within customary tolerances;

(4) work in coordination with or in proximity to others without being distracted by them; (5)

complete a normal workday and workweek without interruptions from psychologically based

symptoms and to perform at a consistent pace without an unreasonable number and length of rest

periods; (6) interact appropriately with the general public; (7) accept instructions and respond

---

[7] "The psychiatric review technique described in 20 CFR §§ 404.1520a and 416.920a and summarized on the Psychiatric Review Technique Form (PRTF) requires adjudicators to assess an individual's limitations and restrictions from a mental impairment(s) in categories identified in the "paragraph B" and "paragraph C" criteria of the adult mental disorders listings.  The adjudicator must remember that the limitations identified in the "paragraph B" and "paragraph C" criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process."  SSR 96-8p, 1996 WL 374184, at *4.

[8] The MRFCA form instructions explain: "The questions below help determine the individual's ability to perform sustained work activities.  However, the actual mental residual functional capacity assessment is recorded in the narrative discussion(s), which describe how the evidence supports each conclusion.  This discussion(s) is documented in the explanatory text boxes following each category of limitation (i.e., understanding and memory, sustained concentration and persistence, social interaction and adaptation).  Any other assessment information deemed appropriate may be recorded in the MRFC – Additional Explanation text box."  Tr. 75.  Case law discussing "Section I" and "Section III" therefore remains relevant.

appropriately to criticism from supervisors; (8) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and (9) respond appropriately to changes in the work setting.  Tr. 96-97.  Dr. Sorenson found that Ms. Dwyer had *marked limitations* in her ability to carry out detailed instructions.  Tr. 96.

In Section III, Dr. Sorenson assessed that Ms. Dwyer could understand, remember and carry out detailed but not complex instructions, make decisions, attend and concentrate for two hours at a time, interact adequately with co-workers and supervisors and respond appropriately to changes in a work setting.  Tr. 97.

The ALJ accorded Dr. Sorenson's assessment partial weight.  Tr. 39.  She explained that "[w]hile I agree the claimant is capable of a reduced range of light work, I find the claimant's combined impairments require more restrictions than the state agency found."  *Id.*

### 3.   Stephen Drake, Ph.D.

On May 25, 2017, nonexamining State agency psychological consultant Stephen Drake, Ph.D., reviewed the medical evidence record at reconsideration.  Tr.118-20, 126-28.  Dr. Drake affirmed Dr. Sorenson's PRT ratings, Section I MRFCA findings, and Section III assessment as consistent with the evidence of record.  *Id.*

The ALJ accorded Dr. Drake's assessment partial weight.  Tr. 39.  She explained that "[w]hile I agree the claimant is capable of a reduced range of light work, I find the claimant's combined impairments require more restrictions than the state agency found."  *Id.*

### 4.   Nathan Holladay, M.D.

On June 1, 2017, Ms. Dwyer presented to Nathan Holladay, M.D., a specialist in chronic fatigue syndrome/myalgic encephalomyelitis and fibromyalgia, for evaluation of her fatigue, exhaustion, brain fog and memory loss.  Tr. 1025-35.  Dr. Holladay took Ms. Dwyer's family,

social, employment, medical and medication histories, and conducted a detailed intake on each of Ms. Dwyer's alleged symptoms.  *Id.*  Dr. Holladay noted a full 14-point review of systems and results from a short-form health survey (Form SF-36).  Tr. 1029-30.

On physical exam, Dr. Holladay indicated, *inter alia,* that Ms. Dwyer tested positive on 15-16/18 fibromyalgia tender points, that she appeared drowsy with decreased alertness near the end of the visit, and that her affect was somewhat blunted.  Tr. 1031-32.  Dr. Holladay indicated that Ms. Dwyer met certain criteria for chronic fatigue syndrome based on criteria established by the Institute of Medicine, *i.e.,* (1) impairment in function with profound fatigue for 6+ months; (2) postexertional malaise; (3) unrefreshing sleep; (4) cognitive impairments; and (5) orthostatic intolerance.  Tr. 1043.  Dr. Holladay also indicated that Ms. Dwyer met certain criteria for chronic fatigue syndrome based on the 1994 Fukuda criteria for establishing chronic fatigue syndrome, *i.e.,* (1) postexertional malaise lasting more than 24 hours; (2) unrefreshing sleep; (3) significant impairment of short-term memory or concentration; (4) muscle pain; (5) pain in the joints without redness or swelling (possibly mild); and (6) tender lymph nodes in the neck or armpit (possibly).  Tr. 1032-33.  Dr. Holladay determined that Ms. Dwyer met the Institute of Medicine's criteria for chronic fatigue syndrome and "arguably meets criteria for fibromyalgia syndrome as well."  Tr. 1033.  Dr. Holladay assessed that

> [Ms. Dwyer's] ME/CFS is at least moderate in severity.  In terms of her level of function, she had to quit her part-time self-employment, and with her combination of cognitive and physical issues, in particular with the postexertional flares that she is prone to experiencing consistent with the recognized behaviors of ME/CFS, in my estimation it would be very difficult or impossible to fulfill the obligations of a regular, sedentary part-time job in her current state.  My hope is that through proper supportive management, she might be able to make at least modest improvement in her condition.

Tr. 1033.

The ALJ gave Dr. Holladay's opinion little weight.  Tr. 39.  She explained that "[t]his opinion was based on one examination, and on the erroneous assumption that the claimant had chronic fatigue syndrome."  *Id.*

### 5.     Michael Carvajal, Psy.D., BDB and S. Laura Lundy, Ph.D.

On July 3, 2017, Ms. Dwyer presented to UNM Health Sciences Center for a neuropsychological evaluation by Michael Carvajal, Psy.D., BDB and S. Laura Lundy, Ph.D., based on a referral by neurologist, Dr. Kader Abdelerahman.  Tr. 1160-1177.  Dr. Abdelerahman requested assistance in assessing Ms. Dwyer's current level of neurocognitive functioning, to assist in differential diagnosis, and to make treatment recommendations as needed.  Tr. 1160. Drs. Carvajal and Lundy took Ms. Dwyer's history related to her alleged cognitive impairment. Tr. 1161-62.  They also took Ms. Dwyer's psychiatric, developmental, medical, family, academic, occupational, and social histories.  Tr. 1162-64.  Drs. Carvajal and Lundy observed, *inter alia,* that Ms. Dwyer arrived on time to her appointment, was unaccompanied, was neatly dressed and groomed, was alert and fully oriented in all spheres, had spontaneous speech that was fluent, clear, and coherent; had no word-finding difficulties; no difficulties with language comprehension; and answered examiner questioning appropriately and evidenced comprehension of all test parameters.  Tr. 1165.  Drs. Carvajal and Lundy also observed that Ms. Dwyer's mood was dysthymic; her affect was constricted; her thought process was logical, linear and goal directed; and her insight and judgment were marginal.  *Id.*  They noted that Ms. Dwyer was attentive and cooperative during the interview and evaluation and that she evidenced adequate testing effort on both stand-alone and embedded measures of performance validity.  *Id.*

Drs. Carvajal and Lundy administered a number of neuropsychological tests.  Tr. 1164-65. They summarized that Ms. Dwyer's neurocognitive profile was largely consistent with her

estimated premorbid baseline (estimated premorbid functioning was in the superior range).  Tr.

1169.  They stated:

> [t]here is absolutely no evidence of a neurocognitive deficit in any of the domains
> assessed at the time of this evaluation.  Ms. Dwyer should be reassured by these
> findings.  However, it is likely that persistent dysthymia and intermittent major
> depressive episodes have negatively affected her functioning throughout the course
> of her life.  Moreover, a marked tendency toward somatization of emotional distress
> is likely influencing her current somatic symptoms, with each acting synergistically
> to amplify one another (i.e. her emotional difficulties affect her physical functioning
> by intensifying her perceived pain levels and contributing to feeling of
> fatigue/malaise, while somatic difficulties affect her daily functioning contributing
> to worsening depressive symptomatology).   While chronic fatigue syndrome
> remains a controversial and hotly debated diagnostic entity with an indeterminate
> etiology and ill-defined diagnostic criteria, research evidence suggests that a
> premorbid history of major depression is a significant predisposing risk factor for
> chronic fatigue syndrome and that the two conditions are closely related
> physiologically.  Moreover, untreated depression in combination with a tendency
> toward somatization will serve to intensify the functional difficulties associated with
> chronic fatigue syndrome, while diminishing a person's quality of life to a greater
> extent that chronic fatigue syndrome in isolation.  Therefore, Ms. Dwyer is strongly
> encouraged to continue her behavioral health treatments and to incorporate
> adjunctive interventions . . . as she sees fit.  Moreover, a medication review may be
> warranted, as Seroquel is a sedating agent with neurocognitive side effects.
> Furthermore, it is not a first line agent for depression.  Ms. Dwyer is encouraged to
> work with her treatment providers as outlined below.

 Tr. 1169-70.  Drs. Carvajal and Lundy made Axis I diagnoses of persistent depressive disorder

(dysthymia), moderate, and somatic symptom disorder, moderate.  Tr. 1170.  They made several

treatment recommendations including medical follow-up, adjunctive interventions, pain

management, healthy living, sleep hygiene, and repeat evaluation.  Tr. 1170-72.

### 6.    Lynette Abrams-Silva, Ph.D.

On May 24, 2018, Ms. Dwyer presented to Southwest Neuropsychology & Behavioral

Health, LLC, for neuropsychological evaluation by Lynette Abrams-Silva, Ph.D., based on a

referral by her behavioral healthcare provider Shari Scott, CNP, Ph.D.  Tr. 1541-47.  Dr. Scott

referred Ms. Dwyer for evaluation of Ms. Dwyer's current cognitive functioning, diagnostic

clarity, and for treatment planning purposes.  Tr. 1541.  Ms. Dwyer reported that her primary care

physician had recommended a second neuropsychological evaluation since she had undergone

hyperbaric treatment for exposure to carbon monoxide.  *Id.*  Dr. Abrams-Silva noted:

> Ms. Dwyer reported that she began to notice symptoms in the autumn of 2014,
> including fatigue, thinking and memory changes, nausea, and head and body aches.
> After seeking a medical explanation and treatment for over three years, a low-level
> carbon monoxide leak was reportedly discovered in her home.  She reported that
> since this was discovered, and after undergoing hyperbaric treatment she has
> improved "in some way."  She stated her sleep, math abilities, and fatigue have all
> improved with treatment, though cognitive functions and fatigue have reportedly not
> returned to baseline.  . . .

Tr. 1541.  Ms. Dwyer reported that she continued to have memory problems; difficulties with

sustained attention, concentration and thinking clearly; a return of fatigue; increased irritability

and anxiety; and feelings of depression.  *Id.*

Dr. Abrams-Silva took Ms. Dwyer's developmental and medical histories.  Tr. 1541-42.

On mental status exam, Dr. Abrams-Silva observed that Ms. Dwyer was alert and fully oriented;

was neatly dressed and appropriately groomed; her speech was normal in rate, volume, and

prosody; there was no evidence of word-finding difficulties of comprehending test instructions.

Tr. 1542.  Dr. Abrams-Silva also observed that Ms. Dwyer's mood was euthymic, although she

was occasionally anxious and tearful, and her thought processes were linear and goal-directed.  *Id.*

Dr. Abrams-Silva indicated that Ms. Dwyer put forth adequate effort on all tests and that the

current test scores were considered a valid representation of her current neuropsychological

functioning.  Tr. 1543.

Dr. Abrams-Silva administered a number of psychological tests.  Tr. 1543.  Dr. Abrams-

Silva summarized the results as follows:

> Prior testing suggested premorbid intellectual functioning in the superior range.  On
> the present evaluation Ms. Dwyer demonstrated that she is a woman of superior
> intellectual functioning, who is currently evidencing some specific cognitive

difficulties.  Regarding memory, Ms. Dwyer demonstrated the capacity for intact encoding and retrieval of both verbal and non-verbal information  It is worth noting she demonstrated difficulty with initial learning of unstructured information across modalities, and greater difficulty overall learning and remembering unstructured verbal information  It is worth noting this is more consistent with executive functioning difficulties, rather than a true memory deficit.  Attention and working memory were generally intact, though it is worth noting that working memory represented a relative weakness, falling well below verbal, visuospatial, and processing speed performances.  Processing speed performances were intact, though motor speed was somewhat below expectation.  Verbal abilities were consistently intact, however, it is worth noting she demonstrated relative difficulty on a verbal task of increased executive functioning demand (semantic switching).  Visuospatial/visuoconstructional abilities were also generally intact, but with relative difficulty demonstrated with spatial planning.  Executive functioning was variable across testing, and overall represented a relative weakness.  She is currently reporting significant emotional distress, depression, anxiety, as well as significant somatic and cognitive symptoms.  Additionally, she currently meets DSM5 criteria for PTSD.

The resulting cognitive profile is characterized by relative weaknesses in working memory and executive functioning.  These are particularly apparent in the areas of verbal memory, immediate learning, and visuospatial planning, along with somewhat reduced fine motor dexterity.  This pattern of particular difficulties is consistent with sequelae of exposure to carbon monoxide.  While hypothyroidism has also been shown to be associated with working memory difficulties, and may be contributing to or exacerbating her symptoms, this alone would not explain the extent of her demonstrated difficulties.  Similarly, mood symptoms have been shown to be associated with working memory and executive functioning difficulties, but would not alone account for this particular pattern of cognitive difficulties or the entirety of her clinical presentation.

Tr. 1545-46.  Dr. Abrams-Silva assessed and recommended, *inter alia*, that

. . . .

2.      Based on current test results, and the body of scientific literature on sequelae of carbon monoxide exposure, it is likely that overall difficulties in executive functioning and working memory, specifically difficulties in verbal memory, immediate learning, and visuospatial planning, along with a low threshold for fatigue will persist.   Therefore, the following accommodations are recommended should she wish to pursue employment:

        a.      A part-time schedule due to persisting low threshold for fatigue;

        b.      Given demonstrated cognitive difficulties, she would benefit from increased structure in the work environment, including: a set

> schedule that does not change; clearly outlined goals and
> expectations provided in writing; a quiet, distraction-free work
> environment; completing tasks one at a time; completing tasks
> without time pressure; details and procedures provided in writing
> when learning new tasks.

. . .

Tr. 1546-47.

The ALJ accorded Dr. Abrams-Silva's opinion little weight.  The ALJ explained, "[f]or

the reasons explained above, I do not find the claimant's complaints of disabling fatigue and

difficulty concentrating and performing tasks are consistent with the overall evidence."  Tr. 39.

### B.   The ALJ Failed To Apply the Correct Legal Standards in Weighing Dr. Steinman's Opinion and Her Reasons for Discounting His Opinion Are Not Supported by Substantial Evidence

Ms. Dwyer argues that the ALJ's reasons for finding Dr. Steinman's opinion to be

inconsistent with the record are not supported by substantial evidence.  Ms. Dwyer asserts that

while the record supports that her mental health symptoms waxed and waned, and that at times

she expressed improvement, that a closer look at the evidence demonstrates that the ALJ's

conclusion that Ms. Dwyer's symptoms had improved with treatment is not supported by

substantial evidence.  Doc. 28 at 9-10.  Ms. Dwyer also asserts that the ALJ failed to explain how

Drs. Carvajal and Lundy's neuropsychological assessment is inconsistent with Dr. Steinman's

opinion.  *Id.*

The Commissioner contends that the ALJ acknowledged that Dr. Steinman thought

Ms. Dwyer's anxiety, lack of self-confidence, and fatigue could be interfering with her ability to

carry out tasks, and that her anxiety could interfere with her short-term memory and processing

speed.  Doc. 31 at 15 (citing Tr. 35, 787-788).  The Commissioner further contends that the ALJ

also recognized that Ms. Dwyer's "somatic symptoms, anxiety and depression likely contributed

to her pain complaints and also to her memory, concentration, and processing speed deficits."  *Id.*

(citing Tr. 38).  However, the Commissioner argues that the ALJ reasonably disagreed, based on substantial evidence in the record, with Dr. Steinman's conclusions and found that Plaintiff had only moderate and not marked limitations in functioning.  *Id.*  In support, the Commissioner argues that the ALJ pointed out that Ms. Dwyer was able to engage in many activities, such as excelling at neuropsychological testing, providing a good history to doctors, doing bookkeeping and volunteering at her synagogue, managing her household, attending appointments, keeping track of medications, and advocating on her behalf for appropriate testing and treatment.  *Id.* at 15-16.  The Commissioner further argues that the ALJ noted that Ms. Dwyer could drive, including long distances; could maintain relationships; could occasionally attend religious services; spend time with others; have appropriate interactions with her doctors and at the hearing; and care for others, including her son, her in-laws, and a friend with cancer.  *Id.*  Lastly, the Commissioner argues that the ALJ explained elsewhere in her determination that Drs. Carvajal and Lundy concluded that Ms. Dwyer had "very strong neurocognitive performances across nearly every domain assessed, including attention, working memory, processing speed, executive functioning, learning/memory across modalities, and language processing" and there was "absolutely no evidence of a neurocognitive deficit."  *Id.*  As such, the Commissioner contends that the ALJ adequately demonstrated that Dr. Steinman's opinion was inconsistent with other medical source opinion evidence in the record.  *Id.*

The applicable regulations and case law require an ALJ to consider all medical opinions and discuss the weight assigned to those opinions.[9]  *See* 20 C.F.R. §§ 404.1527(c); *see also*

---

[9] The agency issued new regulations regarding the evaluation of medical source opinions for claims filed on or after March 27, 2017.  *See* "Revisions to Rules Regarding the Evaluation of Medical Evidence," 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017); (Doc. 19 at 4 n.3.).  However, because Ms. Dwyer filed her claim in 2016, the previous regulations for evaluating opinion evidence apply to this matter.  *See* 20 C.F.R. 416.927.

*Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir. 2004) ("[a]n ALJ must evaluate every medical opinion in the record, although the weight given each opinion will vary according to the relationship between the disability claimant and the medical professional.").  "An ALJ must also consider a series of specific factors in determining what weight to give any medical opinion." *Hamlin*, 365 F.3d at 1215. (citing *Goatcher v. United States Dep't of Health & Human Servs.*, 52 F.3d 288, 290 (10th Cir. 1995)).[10]  An ALJ's decision need not expressly apply each of the six relevant factors in deciding what weight to give a medical opinion.  *Oldham v. Astrue*, 509 F3d. 1254, 1258 (10th Cir. 2007).  However, the decision must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinions and reasons for that weight."  *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003). The ALJ's decision for according weight to medical opinions must be supported by substantial evidence.  *Hackett v. Barnhart*, 395 F.3d 1168, 1174 (10th Cir. 2005).  An ALJ is required to give controlling weight to the opinion of a treating physician if is it supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record.  *Id.*  Generally the opinion of a treating physician is given more weight than that of an examining consultant, and the opinion of a non-examining consultant is given the least weight of all.  *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004).  "If an ALJ intends to rely on a nontreating physician or examiner's opinion, he must explain the weight he is giving to it."  *Hamlin*, 365 F.3d at 1215.

---

[10] These factors include the examining relationship, treatment relationship, length and frequency of examinations, the degree to which the opinion is supported by relevant evidence, the opinion's consistency with the record as a whole, and whether the opinion is that of a specialist.  *See* 20 C.F.R. § 404.1527(c)(2)-(6).

The ALJ's discussion regarding Dr. Steinman's opinion is not sufficiently specific to make clear to the Court the weight the adjudicator gave and the reasons for the weight accorded. As an initial matter, the ALJ failed to state at all what weight, if any, she accorded Dr. Steinman's opinion. That aside, the ALJ's explanations for discounting and/or rejecting Dr. Steinman's opinion are both unclear and not supported by substantial evidence. For example, the ALJ broadly states that Dr. Steinman's opinion is not consistent with the record. Tr. 39. This is insufficient. This court is neither required—nor, indeed, empowered—to parse through the record to find specific support for the ALJ's decision. Such generalized, global references to the record make the ALJ's opinion nearly impossible to review, and certainly do not constitute substantial evidence in support of the Commissioner's disability determination. *Gutierrez v. Colvin*, 67 F. Supp. 3d 1198, 1203 (D. Colo. 2014). Moreover, the Commissioner's reliance on *Endriss v. Astrue*, 506 F. App'x 772, 777 (10th Cir. 2012) (unpublished) to overcome the ALJ's bare reference to the record at large is unavailing. In *Endriss*, the Tenth Circuit explained that even though the ALJ failed to provide a contemporaneous discussion of medical evidence relied upon for discounting certain medical opinion evidence, the ALJ cited to a number of exhibits in the record as part of his explanation for the weight accorded to the medical opinion evidence, and that the ALJ had previously discussed that evidence. *Endriss*, 506 F. App'x at 775. That is not the case here. Instead, the ALJ, without more, rejected Dr. Steinman's opinion as inconsistent with the entire record and failed to cite to any specific evidence in doing so. As such, it is not clear to the Court what evidence the ALJ is relying on from her discussion of the evidence elsewhere to determine that Dr. Steinman's opinion is not consistent with the record. Additionally, the Commissioner's attempt to fill in the evidentiary gap on behalf of the ALJ is improper.[11] *See*

---

[11] The Commissioner primarily points to the ALJ's discussion of Ms. Dwyer's daily activities to support that the ALJ reasonably found that Dr. Steinman's opinion was inconsistent with the record. Doc. 31 at 15-16. These activities

*Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995) (quoting *Reyes v. Bowen*, 845 F.2d 242, 244

(10th Cir. 1988)) ("It is well settled the administrative agencies must give reasons for their

decisions."); *see also Haga v. Astrue*, 482 F.3d 1205, 1207-08 (10th Cir. 2007) ("this court may

not create or adopt post-hoc rationalizations to support the ALJ's decision that are not apparent

from the ALJ's decision itself.").

Similarly, the ALJ failed to adequately explain how Drs. Carvajal and Lundy's

neuropsychological assessment is "not consistent" with Dr. Steinman's opinion.  Elsewhere in her

determination the ALJ discussed Drs. Carvajal and Lundy's neuropsychological assessment and

noted:

> "there was absolutely no evidence of a neurocognitive deficit in any of the domains
> assessed at the time of this evaluation . . .   However, it likely that persistent
> dysthymia with intermittent major depression episodes have negatively affected her
> functioning throughout the course of her life" (42F/117).  Dr. Carvajal also thought

included, *inter alia*, Ms. Dwyer's ability to do bookkeeping and volunteering at her synagogue, keep track of her medications, attend religious services, manage her household, and care for others.  Doc. 31 at 15-16.  Even if considered, however, the specific facts behind these generalities paint a very different picture.  *See generally Krauser v. Astrue*, 638 F.3d 1324, 1333 (10th Cir. 2011) (finding that the specific facts of claimant's daily activities painted a very different picture than the generalities relied upon by the ALJ).  Here, Ms. Dwyer reported to her counselor that she volunteered *one hour* per week to do bookkeeping and *one hour* per week to do volunteering at her synagogue.  Tr. 1018.  Ms. Dwyer testified that she keeps signs up in her bedroom to take her medications.  Tr. 75.  Ms. Dwyer reported that she attends religious services at the synagogue on average *one time per month*.  Tr. 275.  Ms. Dwyer reported that while her teenage son lives with her, her ex-husband takes care of him several days each week.  Tr. 272.  Moreover, Ms. Dwyer was assigned a caregiver through her health insurer to do household chores such as washing dishes, vacuuming, laundry, changing linens, and running errands because she is unable to manage those household chores.  Tr. 70-71.  Finally, although Ms. Dwyer reported driving a friend around who had cancer and traveling to see her elderly family and in-laws in poor health, she also reported that driving her friend's car with manual transmission exacerbated her symptoms and at no time did Ms. Dwyer report that she was providing "care" to either her friend or her elderly family.  Tr. 817, 1256.  Thus, when considered at a more detailed realistic level, Ms. Dwyer's daily activities are more consistent with the nonexertional mental limitations Dr. Steinman assessed that Ms. Dwyer's fatigue, *inter alia*, would interfere with her ability to carry out tasks required of her.  *Krauser*, 638 F.3d at 1333); *see also Thompson v. Sullivan*, 987 F.2d 1482, 1490 (10th Cir. 1993) (finding that sporadic performance of activities of daily living does not establish that a person is capable of engaging in substantial gainful activity).  The Commissioner also points to the ALJ's discussion about Ms. Dwyer's attending medical appointments and advocating on her behalf for appropriate testing and treatment as evidence that Dr. Steinman's opinion is inconsistent with the record as a whole.  Doc. 31 at 15-16.  Yet "persistent attempts to obtain relief of symptoms, such as increasing dosages and changing medications, trying a variety of treatments, referrals to specialists, or changing treatment sources may be an indication that an individual's symptoms are a source of distress and may show that they are intense and persistent."  SSR 16-3p, 2017 WL 5180304, at *9.  As such, the Court is not persuaded that Ms. Dwyer's persistence in seeking medical care and treatment for her alleged impairments is a legitimate basis for discounting Dr. Steinman's opinion.

that significant somatization could be influencing the claimant's clinical presentation (42F/118).  As previously noted, he recommended a medication review, as Seroquel was a sedating agent with neurocognitive side effects and not a first line agent for depression (42F/117).  He also noted that claimant was currently applying for Social Security disability benefits (42F/111).  He strongly encouraged her to continue behavioral therapy, because he felt that a marked tendency toward somatization of emotional distress was likely influencing her somatic symptoms, with each acting to amplify one another (30F/10-11).

Tr. 35.  The Commissioner argues that this discussion adequately demonstrates support for the ALJ's explanation that Dr. Steinman's opinion was inconsistent with Drs. Carvajal and Lundy's opinion.  Doc. 31 at 16-17.  The Court disagrees.  While the Commissioner is correct that the ALJ acknowledged Drs. Carvajal and Lundy's observations regarding Ms. Dwyer's persistent dysthymia and intermittent major depressive episodes, and her marked tendency toward somatization, the ALJ failed to acknowledge or discuss Dr. Carvajal and Lundy's observations regarding the impact of these alleged mental impairments on Ms. Dwyer's daily functioning, *i.e,* that Ms. Dwyer's "emotional difficulties affect her physical functioning by intensifying her perceived pain levels and contributing to feeling of fatigue/malaise, while somatic difficulties affects her daily functioning contributing to worsening depressive symptomatology."  Tr. 1169.  Moreover, the ALJ failed to acknowledge or discuss that Drs. Carvajal and Lundy's observations regarding the impact of Ms. Dwyer's alleged mental impairments on her daily functioning were consistent with Dr. Steinman's opinion that Ms. Dwyer's mental impairments of anxiety and depression, along with fatigue, would interfere with her ability to do work related mental activities.  Tr. 792.  "It is improper for the ALJ to pick and choose among medical reports, using portions of evidence favorable to his position while ignoring other evidence."  *Hardman v. Barnhart*, 362 F.3d 676, 681 (10th Cir. 2004) (citing *Switzer v. Heckler*, 742 F.2d 382, 385-86 (7th Cir. 1984)); *see also Clifton,* 79 F.3d at 1009 (the record must demonstrate that the ALJ

considered all of the evidence and must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects).

For the foregoing reasons, the Court finds that the ALJ's evaluation of Dr. Steinman's opinion is not sufficiently specific with respect to the weight or the reasons for the weight she accorded.  Additionally, the Court finds that the ALJ's explanation that Dr. Steinman's opinion is inconsistent with Drs. Carvajal and Lundy's neuropsychological evaluation is not supported by substantial evidence.  This is reversible error.

C.      **The ALJ Failed To Apply the Correct Legal Standards in Weighing Dr. Holladay's Opinion and Her Reasons for Discounting His Opinion Are Not Supported by Substantial Evidence**

Ms. Dwyer argues that the ALJ ignored several regulatory factors when weighing Dr. Holladay's opinion, including that he is a specialist in the field of chronic fatigue syndrome, that he examined and interviewed Ms. Dwyer, spent over 4.5 hours on her evaluation, and supported his findings.  Doc. 28 at 12.  Ms. Dwyer argues that while the ALJ did not find chronic fatigue syndrome to be an impairment because it did not meet the requirements in SSR 14-1p, which does not use the Institute of Medicine criteria to establish the impairment, the ALJ nonetheless determined that "the carbon monoxide exposure could explain the claimant's fatigue."  *Id*.  Ms. Dwyer asserts that the ALJ's failure to properly weigh Dr. Holladay's opinion is not harmless error.  *Id.*

The Commissioner contends that the ALJ reasonably discounted Dr. Holladay's opinion because the ALJ correctly found that Ms. Dwyer had not established chronic fatigue syndrome as an impairment because the record did not sufficiently rule out other causes of her fatigue, as required by SSR 14-1p .  Doc. 31 at 17-19.  The Commissioner further contends that the ALJ was not required to accept Dr. Holladay's assessment because it touched on an issue that is reserved to

23

the Commissioner, *i.e.,* that it would be very difficult or impossible to fulfill the obligations of a regular, sedentary part-time job in her current state. *Id.*

The ALJ's explanations for rejecting Dr. Holladay's opinion are not supported by substantial evidence. Here, the ALJ accorded little weight to Dr. Holladay's opinion by explaining that "[t]his was based on one examination, and on the erroneous assumption that the claimant had chronic fatigue syndrome." Tr. 39. Elsewhere, the ALJ stated that "[r]egarding chronic fatigue syndrome, the record does not sufficiently rule out other causes (*see* SSR 14-1p)." Tr. 31. As to the first reason, a one-time consultative examination is not a valid basis for rejecting an opinion. *Chapo v. Astrue*, 682 F.3d 1285, 1291 (finding that a limited treatment history by itself is an invalid basis for rejecting a medical source opinion). Although the ALJ should consider the length of a treatment relationship in weighing a *treating source* medical opinion, 20 C.F.R. § 416.927(c)(2)(i), to dismiss a consultative exam on this basis essentially renders them "worthless, when in fact they are often fully relied on as the dispositive basis for RFC findings." *Chapo*, 682 F.3d at 1291. Further, the regulations governing medical opinions recognize that an examining medical-source opinion is presumptively entitled to more weight than a doctor's opinion derived from a review of the medical records. *Id.* (citing 20 C.F.R. § 416.927(c)(1)).

As to the ALJ's second reason, the Court is not persuaded that the ALJ's perfunctory rejection of Dr. Holladay's opinion is supported by SSR 14-1p's guidance on how to evaluate claims involving CFS. SSR 14-1p states in pertinent part as follows:

> II.  *How does a person establish an MDI[12] of CFS?*
>
> A.  *General*
>
> 1.  A person can establish that he or she has an MDI of CFS by providing appropriate evidence from an acceptable medical

_____

[12] "Medically determinable impairment"

source.[13]  A licensed physician (a medical or osteopathic doctor) is the only acceptable medical source who can provide such evidence. We cannot rely upon the physician's diagnosis alone.  The evidence must document that the physician reviewed the person's medical history and conducted a physical exam.  We will review the physician's treatment notes to see if they are consistent with the diagnosis of CFS; determine whether the person's symptoms have improved, worsened, or remained stable; and establish the physician's assessment of the person's physical strength and functional abilities.

2.      We will find that a person has an MDI of CFS if a licensed physician diagnosed CFS, and this diagnosis is not inconsistent with the other evidence in the person's case record.  Under the CDC case definition, a physician can make the diagnosis of CFS *based on a person's reported symptoms alone after ruling out other possible cause of the person's symptoms*.  However, as mentioned, statutory and regulatory provisions require that, for evaluation of claims of disability under the Act, there must also be medical signs or laboratory findings before we may find that a person has an MDI of CFS.  If we cannot find that the person has an MDI of CFS but there is evidence of another MDI, we will not evaluate the impairment under this SSR.  Instead, we will evaluate it under the rules that apply for that impairment.

SSR 14-1p, 2014 WL 1371245, at *4 (emphasis added) (citations omitted).  The ALJ relies on

one provision, to the exclusion of all others, in this regulation, *i.e.,* the necessity of *ruling out*

*other causes* before making a finding of CFS as an MDI, to summarily reject Dr. Holladay's

opinion and ignore all of his findings.  This is insufficient.  As an initial matter, a close reading of

the provision the ALJ relied upon indicates that *the ruling out of other causes* is necessary only

when a physician is making a diagnosis *based on a person's reported symptoms alone*.  Here,

Dr. Holladay did not make his diagnosis based on Ms. Dwyer's reported symptoms alone.

Instead, as previously discussed, Dr. Holladay took a thorough intake of Ms. Dwyer's family,

---

[13] For claims filed before March 27, 2017, "acceptable medical sources" are licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists.  SSR 06-03p, 2006 WL 2329939, at *1; SSR 96-2p, 2017 WL 3928298.

social, employment, medical and medication histories; reviewed relevant medical records; and conducted a physical exam.  Tr. 1026-32.  *See* SSR 14-1p, 2014 WL 1371245, at *4 (stating that only an acceptable medical doctor can provide a diagnosis of CFS and the evidence must document that the physician reviewed the person's medical history and conducted a physical exam).  Moreover, the ALJ failed to properly evaluate Dr. Holladay's opinion and evaluate it in light of the entirety of SSR 14-1p and the relevant regulatory factors.  For example, Dr. Holladay, a specialist in chronic fatigue syndrome, documented on physical exam, *inter alia*, orthostatic intolerance, that Ms. Dwyer tested positive on 15-16/18 fibromyalgia tender points,[14] and that Ms. Dwyer met the criteria for chronic fatigue syndrome based on the criteria established by the Institute of Medicine and the 1994 Fukuda criteria for establishing chronic fatigue syndrome.  Tr. 1031-33; see SSR 14-1p, 2014 WL 1371245, at *3-4 (describing diagnostic symptoms of CFS and stating there must be at least one medical sign before we may find that a person has an MDI of CFS); *see also* 20 C.F.R. 404.1527(c)(3) and (5) (generally the more a provider supports his opinion and whether the physician is a specialist in the area upon which an opinion is rendered, the more weight is given).   Dr. Holladay also opined on the severity of Ms. Dwyer's chronic fatigue syndrome and the resulting limitations.[15]  *Id.; see generally Montecalvo v. Comm'r of Soc. Sec.*, 695 F. App'x 124, 130 (6th Cir. 2017) (finding no error where the ALJ failed to consider

---

[14] SSR 14-1p states that "[t]here is considerable overlap of symptoms between CFS and FM, but people with CFS who also have tender points have an MDI.  People with impairments that fulfill the American College of Rheumatology criteria for FM (which include a minimum number of tender points) may also fulfill the criteria for CFS.  *See* SSR 12-1p.  However, we may still find that a person with CFS has an MDI if he or she does not have a specific number of tender points to establish FM."  SSR 14-1p, WL 1371245, at *4 fn. 21.

[15] As to Dr. Holladay's opined limitations, the Commissioner argues that Dr. Holladay improperly opined on an issue reserved to the Commissioner, *i.e.,* that Ms. Dwyer would be unable to fulfill the obligations of a regular, sedentary part-time job in her current state, and that the ALJ reasonably discounted Dr. Holladay's opinion on this basis.  Doc. 31 at 18-19.  The ALJ, however, did not raise this as a reason for discounting Dr. Holladay's opinion.  As such, the Commissioner's argument amounts to post-hoc rationalization.  *Kepler,* 68 F.3d at 391; *Haga,* 482 F.3d at 1207-08.

claimant's chronic fatigue pursuant to SSR 14-1p where physician did not provide a medical

opinion regarding claimant's CFS, did not address the severity of CFS, did not indicate any

limitations due to CFS, and did not discuss any clinical findings establishing CFS).  The ALJ

failed to address any of these findings that supported Dr. Holladay's opinion.[16]

Additionally, SSR 14-1p states:

E.      Mental Limitations.  Some people with CFS report ongoing problems with
short-term memory, information processing, visual-spatial difficulties,
comprehension, concentration, speech, word-finding, calculation and other
symptoms suggesting persistent neurocognitive impairment.  When ongoing deficits
in these areas have been documented by mental status examination or psychological
testing, such findings may constitute medical signs or (in the case of psychological
testing) laboratory findings that establish the presence of an MDI.  When medical
signs or laboratory findings suggest a persistent neurological impairment or other
mental problems, and these signs or findings are appropriately documented in the
medical record, we may find that the person has an MDI.

SSR 14-1p, 2014 WL 1371245, at *5.  Here, Dr. Steinman indicated that Ms. Dwyer's WAIS-IV

testing results indicated that:

short-term memory, short-term working memory, and her cognitive-processing
speed are comparative weaknesses amongst her intellectual abilities.  Her short-term
working memory and her cognitive-processing speed are significantly poorer than
her other intellectual abilities.  These differences suggest a possible cognitive
disorder and need to be assessed in more detail.

Tr. 787.  Similarly, Dr. Abrams-Silva assessed Ms. Dwyer's WAIS-IV testing as demonstrating

the following:

[t]he resulting cognitive profile is characterized by relative weakness in working
memory and executive function.  These are particularly apparent in the areas of
verbal memory, immediate learning, and visuospatial planning, along with
somewhat reduced fine motor dexterity.  This pattern of particular difficulties is
consistent with a sequelae of exposure to carbon monoxide.  While hypothyroidism
has also been shown to be associated with working memory difficulties, and may be

---

[16] Elsewhere in the determination, the ALJ discussed that Ms. Dwyer saw Dr. Holladay.  Tr. 33.  The ALJ's discussion,
however, was limited solely to Ms. Dwyer's reports of physical pain.  *Id.*

contributing to or exacerbating her symptoms, this alone would not explain the
extent of her demonstrated difficulties.  Similarly, mood symptoms have been shown
to be associated with working memory and executive functioning difficulties, but
this would not alone account for this particular pattern of cognitive difficulties or
the entirety of her clinical presentation.

Tr. 1546.[17]  Drs. Carvajal and Lundy also opined on the potential impact of a chronic fatigue

syndrome diagnosis on Ms. Dwyer's functional status:

> [w]hile chronic fatigue syndrome remains a controversial and hotly debated
> diagnostic entity with an indeterminate etiology and ill-defined diagnostic criteria,
> research evidence suggests that a premorbid history of major depression is a
> significant predisposing risk factor for chronic fatigue syndrome and that the two
> conditions are closely related physiologically.  Moreover, untreated depression in
> combination with a tendency toward somatization will serve to intensify the
> functional difficulties associated with chronic fatigue syndrome, while diminishing
> a person's quality of life to a greater extent that chronic fatigue syndrome in
> isolation.

Tr. 1169-70.  Thus, the ALJ failed to evaluate Dr. Holladay's opinion in light of the mental

limitations as defined in SSR 14-1p in relationship to other medical opinion evidence in the

record.  *See* 20 C.F.R. 404.1527(c)(4) ("Generally, the more consistent a medical opinion is with

the record as a whole, the more weight we will give to that opinion.")

Lastly, the medical evidence record is replete with Ms. Dwyer's persistent complaints

regarding her fatigue to numerous medical providers over a number of years.  Tr. 422-23, 432-

33, 478, 481-85, 503-06, 525-26, 531-33, 535-37, 623-24, 628-36, 637-44, 645-53, 698-99, 705-

06, 721-22, 723-24, 727-28, 750-51, 752-53, 908-12, 954-56, 972-74, 1083-87, 1025-35, 1124-

26, 1403-06, 1432-34, 1446-48.  *See* SSR 14-1p, 2014 WL 1371245, at *5 (explaining that

longitudinal evidence is needed in cases where chronic fatigue is alleged).  Additionally, the ALJ

---

[17] The Court notes that Ms. Dwyer was referred to Dr. Abrams-Silva for evaluation of her neurocognitive abilities in
light of a recent diagnosis of exposure to carbon monoxide.  As such, Dr. Abrams-Silva did not consider whether
Ms. Dwyer's neurocognitive deficits could be related to chronic fatigue.  The Court also notes that the ALJ accorded
little weight to Dr. Abrams-Silva's opinion.  Ms. Dwyer argues that the ALJ failed to provide specific reasons for
rejecting her opinion.  Doc. 28 at 13-15.  Having found grounds for reversal, the Court does not reach this issue.
*Watkins v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003)

noted, but summarily dismissed, rheumatologist Zain Abideen, M.D.'s June 21, 2017, diagnosis

that Ms. Dwyer's features were suggestive of chronic fatigue.[18] Tr. 1551-55.  As such, the ALJ

failed to properly evaluate Dr. Holladay's opinion in light of this medical record evidence.  *See* 20

C.F.R. 404.1527(c)(4).

      For the foregoing reasons, the Court finds that the ALJ failed to properly evaluate

Dr. Holladay's opinion pursuant to SSR 14-1p, failed to apply the relevant regulatory factors in

evaluating Dr. Holladay's opinion, and failed to provide explanations supported by substantial

evidence for rejecting Dr. Holladay's opinion.  This is reversible error.

      **D.**    **Remaining Issues**

      The Court will not address Ms. Dwyer's remaining claims of error because they may be

affected by the ALJ's treatment of this case on remand.  *Watkins v. Barnhart*, 350 F.3d 1297, 1299

(10th Cir. 2003).

      **E.**    **The Court Will Remand for Additional Administrative Proceedings**

      District courts have discretion to remand either for further administrative proceedings or

for an immediate award of benefits.  *Ragland v. Shalala*, 992 F.2d 1056, 1060 (10th Cir. 1993).  In

making this decision, courts should consider both "the length of time the matter has been pending

and whether or not 'given the available evidence, remand for additional fact-finding would serve

[any] useful purpose but would merely delay the receipt of benefits.'"  *Salazar v. Barnhart*, 468

---

[18] Ms. Dwyer was referred to Dr. Abideen by her primary care physician and she reported "chronic fatigue for the last 2 to 3 years."  Tr. 1551.  Dr. Abideen took Ms. Dwyer's medical history and conducted a physical exam, after which he determined that Ms. Dwyer's features were suggestive of chronic fatigue.  Tr. 1554.  Dr. Abideen also included differential diagnoses of metabolic disease, thyroid disease, and depression and anxiety.  *Id.*  Dr. Abideen indicated that Ms. Dwyer had a few, but not multiple, tender points, and that Ms. Dwyer reported sleeping problems, anxiety and depression, dry mouth and dry eyes.  *Id.*  Dr. Abideen recommended checking on adrenal insufficiency and taking serum cortisol levels.  *Id.*  Dr. Abideen indicated that fibromyalgia was less likely, and he ruled out lupus, rheumatoid arthritis and other connective tissue disease.  *Id.*

F.3d 615, 626 (10th Cir. 2006) (quoting *Harris v. Sec'y of Health & Human Servs.*, 821 F.2d 541, 545 (10th Cir. 1987)).  When the Commissioner has failed to satisfy her burden of proof at step five, and when there has been a long delay as a result of her erroneous disposition of the proceedings, remand for an immediate award of benefits may be appropriate.  *Ragland*, 992 F.2d at 1060 (remanding for an immediate award of benefits "[i]n light of the Secretary's patent failure to satisfy the burden of proof at step five, and the long delay that has already occurred as a result of the Secretary's erroneous disposition of the proceedings").  The Commissioner "is not entitled to adjudicate a case *ad infinitum* until [she] correctly applies the proper legal standard and gathers evidence to support [her] conclusion."  *Sisco v. U.S. Dep't of Health & Human Servs.*, 10 F.3d 739, 746 (10th Cir. 1993) (quoting *Thaete v. Shalala*, 826 F. Supp. 1250, 1252 (D. Colo. 1993)).

Here, Ms. Dwyer states, without more, that the Court has the authority to reverse and award benefits.  Doc. 28 at 20.  The Court, however, is not persuaded that remand for additional fact-finding would merely delay the inevitable receipt of benefits.  There is no evidence that this case has been unnecessarily delayed, and it remains possible that the ALJ could find that Ms. Dwyer was not disabled during the relevant period of time after properly evaluating the medical opinion evidence.  The Court, therefore, is remanding for additional administrative proceedings.

**IT IS SO ORDERED.**

**JOHN F. ROBBENHAAR**
**United States Magistrate Judge**
**Presiding By Consent**